UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HILL DERMACEUTICALS, INC.,<br>Plaintiff,<br><br>v.<br><br>U.S. FOOD AND DRUG<br>ADMINISTRATION, *et al.*,<br>Defendants,<br><br>and<br><br>AMNEAL PHARMACEUTICALS, LLC,<br>Intervenor-Defendant. | Civil Action No. 11-1950 (RCL) |

## ORDER

In accordance with the Court's Order of May 8, 2012, the Court hereby files on the public record a redacted copy (with the redactions proposed by the government) of the Court's May 8, 2012 Memorandum Opinion.

SO ORDERED.


Signed by Royce C. Lamberth, Chief Judge, on May 18, 2012.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HILL DERMACEUTICALS, INC.,<br>Plaintiff,<br><br>v.<br><br>U.S. FOOD AND DRUG<br>ADMINISTRATION, *et al.*,<br>Defendants,<br><br>and<br><br>AMNEAL PHARMACEUTICALS, LLC,<br>Intervenor-Defendant. | Civil Action No. 11-1950 (RCL)<br><br><s>Ex Parte</s> As Redacted May 18. 2012<br><s>Filed Under Seal</s><br><br>**FILED**<br><br>MAY - 8 2012<br><br>Clerk, U.S. District & Bankruptcy<br>Courts for the District of Columbia |

## MEMORANDUM OPINION

Plaintiff Hill Dermaceuticals, Inc. ("Hill") has brought this action against the U.S. Food and Drug Administration ("FDA"); the U.S. Department of Health and Human Services ("HHS"); Kathleen Sebelius, in her official capacity as Secretary of HHS; and Margaret Hamburg, M.D., in her official capacity of Commissioner of FDA. Amneal Pharmaceuticals, LLC ("Amneal") has intervened as a defendant. Hill manufactures fluocinolone acetonide topical oil products under the brand names Derma-Smoothe/FS (Body Oil and Scalp Oil) and Derm-Otic Oil Ear Drops. On October 17, 2011, the FDA approved requests by Identi Pharms, Inc. ("Identi") to market purported generic versions of these fluocinolone acetonide products. Hill moves for summary judgment, requesting that the Court enter a declaratory judgment that FDA's approval of Identi's three abbreviated new drug applications ("ANDAs") constitutes arbitrary and capricious agency action in violation of the Administrative Procedure Act, 5 U.S.C. § 706. Hill also requests that the Court enter a permanent injunction requiring FDA to withdraw or suspend its approval of Identi's ANDAs to prevent the marketing and distribution of Identi's

products. Federal defendants have filed a Motion to dismiss and intervenor defendant has filed a Cross-Motion for summary judgment, requesting that the Court uphold the FDA's approval of Identi's ANDAs.

Upon consideration of plaintiff's Motion [59] for summary judgment, Federal defendants' opposition and Motion [71, 78] to dismiss, intervenor defendant's opposition and Cross-Motion [68] for summary judgment, plaintiff's reply and response [80], Federal defendants' reply [87], intervenor defendant's reply [82], the administrative record, the applicable law, and the entire record in this case, the Court will DENY plaintiff's Motion [59] for summary judgment and GRANT defendants' Motions [68, 71, 78] for summary judgment.[1] Upon consideration of plaintiff's Motion [89] for leave to file two supplemental declarations, Federal defendants' opposition [90], plaintiff's reply [92] thereto, intervenor defendant's opposition [93], plaintiff's reply [95] thereto, the applicable law, and the entire record in this case, the Court will DENY plaintiff's Motion [89] for leave to file. The Court will explain its reasoning in the analysis that follows.

## I.    BACKGROUND

### A. Statutory and Regulatory Framework

#### 1. New Drug Applications and Abbreviated New Drug Applications

Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq., pharmaceutical companies seeking to market "pioneer" or "innovator" drugs must first obtain FDA approval by filing a new drug application ("NDA"). 21 U.S.C. §§ 335(a), (b). The NDA must contain extensive scientific data and other information, including investigative reports

---

[1] "If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Because the Federal defendants rely on the administrative record to support their Motion to dismiss, the Court will treat the Motion as a Motion for summary judgment. Therefore, rather than dismissing the plaintiff's case against the Federal defendants, the Court enters summary judgment in favor of the Federal defendants.

demonstrating the drug's safety and effectiveness, a statement of the drug's components, and specimens of proposed labeling for the packaging of the drug. 21 U.S.C. § 335(b)(1).

The Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Amendments"), codified at 21 U.S.C. § 355 and 35 U.S.C. §§ 156, 271, and 282, permits the submission of abbreviated new drug applications ("ANDAs") for approval of generic versions of drug products with approved NDAs. 21 U.S.C. § 355(j). The Hatch-Waxman Amendments were intended to balance the encouragement of innovation in drug development with the acceleration of the availability of lower cost generic alternatives to innovator drugs. *See* H.R. Rep. No. 98-857 (Part I), 98th Cong., 2d Sess. at 14–15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2547–48; *see also Tri-Bio Labs., Inc. v. United States*, 836 F.2d 135, 139 (3d Cir. 1987).

### 2. ANDA Approval Requirements

To obtain approval, ANDA applicants are not required to submit clinical evidence to establish the safety and effectiveness of the generic drug product. Rather, an ANDA references an approved drug—the reference listed drug ("RLD")—and relies on FDA's previous finding that the RLD is safe and effective. Additionally, an ANDA applicant must provide sufficient information to show that the generic drug product has the same active ingredient or ingredients, dosage form, route of administration, and strength as the RLD. 21 U.S.C. § 355(j)(2)(A)(ii), (iii). An ANDA applicant must also demonstrate that its product is bioequivalent to the RLD and has the same labeling as the RLD. 21 U.S.C. §§ 355(j)(2)(A)(iv), (v). The agency must approve an ANDA unless it finds, among other things, that the ANDA has not provided sufficient evidence of the foregoing. 21 U.S.C. § 355(j)(4).

The FDCA requires that an ANDA contain "information to show that the labeling proposed for the new [generic] drug is the same as the labeling approved for the listed drug . . .

3

except for changes required because of differences approved under a petition filed under [21 U.S.C. § 355(j)(2)(C)] or because the new drug and the listed drug are produced or distributed by different manufacturers." 21 U.S.C. § 355(j)(2)(A)(v). Permissible labeling differences include "differences in expiration date, formulation, bioavailability, . . . [or] labeling revisions made to comply with current FDA labeling guidelines or other guidance." 21 C.F.R. § 314.94(a)(8)(iv).

The FDCA also requires an ANDA to include information showing that the generic drug product is bioequivalent to the pioneer drug product. 21 U.S.C. §§ 355(j)(2)(A)(iv), (j)(4)(F); 21 C.F.R. §§ 314.127(a)(6)(i), 314.94(a)(7). A drug is considered to be bioequivalent if "the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug." 21 U.S.C. § 355(j)(8)(B)(i). FDA regulations further define bioequivalence as "the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives becomes available at the site of drug action when administered at the same molar dose under similar conditions in an appropriately designed study." 21 C.F.R. § 320.1(e). For certain generic drug products, the bioequivalence of the generic may be self-evident. In such cases, the FDA will grant a bioequivalence waiver (or "biowaiver")—that is, the FDA will not require the submission of evidence obtained in vivo demonstrating the bioequivalence of these drug products. A generic drug product's bioequivalence "may be considered self-evident based on other data in the application," and thus FDA will grant a biowaiver, if the drug product: (1) is "an ophthalmic or otic solution"; and (2) "contains the same active and inactive ingredients in the same concentration as a drug product that is the subject of an approved full new drug application or abbreviated new drug application." 21 C.F.R. § 320.22(b)(1)(i)–(ii). Alternatively, FDA will grant a biowaiver if the generic drug product: (1) "is a solution for application to the skin"; (2)

4

"contains an active drug ingredient in the same concentration and dosage form as a drug product that is the subject of an approved full new drug application or abbreviated new drug application"; and (3) "contains no inactive ingredient or other change in formulation from the drug product . . . that may significantly affect absorption of the active drug ingredient." 21 C.F.R. § 320.22(b)(3)(i)–(iii).

### B.  Factual Background

#### 1.  *Hill's Fluocinolone Acetonoide Products*

FDA first approved Hill's new drug application ("NDA") for Derma-Smoothe (fluocinolone acetonide 0.01% topical oil) on February 3, 1988. *See* FDA895; FDA646. Hill's NDA includes Body Oil, Scalp Oil, and Oil Ear Drops, even though they are separate products. FDA646. Derma-Smoothe Body Oil is indicated to topically treat atopic dermatitis for adult patients and some pediatric patients with moderate to severe atopic dermatitis. *Id.* Derma-Smoothe Scalp Oil is indicated to treat scalp psoriasis on adult patients. *Id.* DermOtic Oil Ear Drops are indicated to treat chronic eczematous external otitis in adults and pediatric patients two years of age and older. FDA1238. These products are intended for local, topical use and are not intended to be systemically absorbed. FDA646. FDA has designated Derma-Smoothe as the RLDs for generic fluocinolone acetonide topical oil products.

Hill's Derma-Smoothe products include peanut oil that has been refined in accordance with the United States Pharmacopeia-National Formulary ("USP-NF") standard. FDA668. When Hill submitted a supplement to its NDA in 1998, FDA asked Hill to improve its testing of the Derma-Smoothe product because the then-current USP-NF monograph for peanut oil did not include enough information to ensure that the peanut oil would be sufficiently free of peanut protein. *Id.* FDA requested, and Hill provided, a representation that its peanut oil had been

5

heated to 475°F (250°C) for fifteen minutes. *Id.* Hill amended its NDA to state that Hill would use only peanut oil that had been heat-treated as described, and that Hill tested each lot of peanut oil for residual proteins. *Id.* Hill initially conducted this test using a "sandwich" enzyme-linked immunosorbent assay (S-ELISA) method, which Hill claimed to be capable of detecting peanut protein at a level as low as 2.5 parts per million (ppm). *Id.* Hill used a non-proprietary, commercially available S-ELISA test to detect residual peanut proteins. FDA920; FDA925. FDA approved Hill's NDA supplement, including product labeling that stated, "Peanut oil used in this product is routinely tested for peanut proteins using a sandwich enzyme linked immunosorbent assay test (S-ELISA) kit, which can detect peanut proteins to as low as 2.5 parts per million (ppm)" and "Derma-Smoothe/FS® is formulated with 48% peanut oil, NF, in which peanut protein is not detectable at 2.5 ppm." FDA668 n.85; FDA933; FDA938; FDA940; FDA946; FDA948.

In 2007, Hill submitted another supplement to its NDA proposing to use an amino acid analysis instead of the S-ELISA test, claiming that the amino acid analysis was even more sensitive than the S-ELISA test. FDA669; FDA1113. This change was not mandated by the FDA, but the FDA approved Hill's supplement in December 2007. FDA669. As a result, the current product labeling on Derma-Smoothe includes the following statement: "The peanut oil used in Derma-Smoothe/FS is tested for peanut proteins through amino acid analysis which can detect the quantity of amino acids to below 0.5 parts per million." FDA669 n.87.

In March 2008, FDA informed Hill that the agency was reviewing Hill's amino acid test. FDA asked Hill to provide method validation packages for Hill's S-ELISA and amino acid tests, plus support for Hill's assertion that the amino acid test "provides for increased safety for the peanut oil component and the drug product." FDA1140. In response, Hill stated that it had

replaced the S-ELISA test with the amino acid test and that "the ELISA test kit is not appropriate for use with the refined peanut oil raw material." FDA1143.

FDA concluded that the amino acid test had not been validated. This conclusion was based on results from FDA's laboratory tests, deficiencies in Hill's description of the method, and missing evaluations of validation characteristics. *See* FDA 1176. In a letter dated November 24, 2008, FDA informed Hill that the agency had determined that the amino acid analysis test had not been appropriately validated to reliably quantify residual proteins in peanut oil. *See* FDA1144.

### 2. Hill's Citizen Petition

On September 30, 2004, Hill submitted a citizen petition to FDA requesting that FDA withhold approval of any ANDA for generic versions of Derma-Smoothe products unless: (1) the ANDA applicants comply with statutory requirements to demonstrate that any proposed generic has the same active ingredient, labeling, and conditions of use as Derma-Smoothe products; (2) the ANDA applicants demonstrate that their proposed products are bioequivalent to Derma-Smoothe by conducting studies with the same clinical endpoints that Hill used for approval of Derma-Smoothe, not through use of the vasoconstrictor assay; and (3) FDA imposes specific requirements on ANDA applicants concerning chemistry, manufacturing, and controls. FDA442–43; FDA644–45.

In March 2007, Hill filed suit against FDA and the Commissioner of Food and Drugs to compel the agency to make a final decision on Hill's citizen petition. *See* Complaint, No. 07-cv-552 (D.D.C. Mar. 16, 2007). On November 29, 2007, this Court denied Hill's motion to stay approval by FDA of any generic versions of Derma-Smoothe until FDA provided a substantive response to Hill's citizen petition. *See* Mem. Op., No. 07-cv-552 (D.D.C. Mar. 16, 2007). This

Court ultimately dismissed the action with prejudice in April 2009, pursuant to a stipulation of dismissal following FDA's substantive response to Hill's citizen petition. *See* Order, No. 07-cv-552 (D.D.C. Apr. 27, 2009).

FDA responded to Hill's citizen petition on March 25, 2009. *See* FDA644. Among the issues addressed in Hill's petition and FDA's response, only those pertaining to peanut oil and bioequivalence waivers are relevant here.

FDA denied Hill's request that FDA automatically reject any ANDA unless the labeling is identical to the RLD concerning the amount of peanut protein in the excipient and the test to identify that amount. *See* FDA655. FDA based its decision on portions of the FDCA and FDA regulations providing that a labeling difference between the generic drug product and the RLD may permissibly reflect a difference in manufacturers. *See id.* (citing 21 U.S.C. §§ 355(j)(2)(A)(v), 355(j)(2)(G); 21 C.F.R. § 314.94(a)(8)(iv)).

FDA also rejected Hill's request that FDA: (1) require ANDA applicants to demonstrate that their formulations do not cause an allergic reaction in peanut-sensitive patients and conduct studies on peanut-sensitive patients to establish the safety of their products; (2) set an upper limit for the amount of residual peanut protein; and (3) require ANDA applicants to demonstrate that their peanut oil meets this specification using a test that is "validated and capable of quantifying very low levels of peanut protein." FDA667. FDA explained that it would be sufficient for an applicant to establish that its topical product is made from peanut oil that has been fully refined in accordance with the updated USP-NF standard, because that standard adequately ensures the safety of the peanut oil for the indications in question. FDA667–73.

In the petition response, FDA noted two changes that had occurred since the agency had approved Hill's NDA supplement regarding peanut protein in 1999. First, the agency had

worked closely with representatives from the Pharmaceutical Research and Manufacturers of America, the International Pharmaceutical Excipients Counsel of the Americas, and the USP to update the USP-NF monograph for peanut oil to address the agency's concern regarding the potential safety risk presented by residual proteins in peanut oil. FDA669. Those revisions became effective in 2004. FDA670.

Second, FDA cited a number of studies that supported the conclusion that the USP-NF updated refining process would reduce peanut protein to an acceptable level for the indications at issue. Studies had shown that the quantity of orally administered peanut protein required to produce an allergic response in the peanut-allergenic population studied was greater than 100 parts per million in a standard reference dose of peanut oil. FDA670. FDA also cited evidence in the published literature that the process of refining peanut oil results in the reduction of residual allergenic proteins to negligible levels—probably less than 10 parts per million. FDA noted that this level was "well below the concentration in a standard reference topical dose of peanut oil equivalent to an absolute quantity associated with elicitation of symptoms in peanut-sensitive individuals." FDA671. FDA concluded that the gap between the quantity of orally administered peanut proteins required to cause an allergic reaction, and the level of peanut proteins left in fully refined peanut oil, made it reasonable to conclude that the USP-NF refining process reduced peanut proteins to acceptable levels for the indications in question. *Id.* Finally, FDA observed that Hill had failed to produce any evidence of safety concerns associated with refined peanut oil that met the USP-NF standard, and in fact had asserted that refined peanut oil does not pose safety risks. *Id.*

Based on its review of the evidence, FDA concluded that a manufacturer of fluocinolone acetonide topical oil that is formulated with peanut oil, whether Hill or another manufacturer,

must ensure that the peanut oil used is fully refined and meets the USP-NF standard. FDA673. FDA declined Hill's request to require an additional test to quantify protein in refined peanut oil because such a test would not improve the safety of products formulated with this excipient. *Id.*

FDA also denied Hill's request that the agency require ANDA applicants to conduct clinical safety studies on peanut-sensitive patients to establish the safety of the peanut oil used in their products. FDA reasoned that the Hatch-Waxman Amendments were intended to eliminate this very type of duplication of safety tests, and that clinical studies using particular batches of peanut oil NF could not provide assurance of the safety of other batches that might contain a different amount of peanut allergen. FDA673–74. FDA concluded that the process controls included in the USP-NF specification were a more reliable way to ensure the safety of each batch. FDA674.

### 3. *Derma-Smoothe Labeling*

At the time FDA responded to Hill's citizen petition, Hill had two supplemental NDAs pending before the agency. Supplement ▓ related to the labeling format and the statement regarding the amino acid test for peanut protein. FDA1193. Supplement ▓ related to Hill's effort to validate the amino acid test. FDA1301.

FDA informed Hill that Supplement ▓ was not approvable because the company's amino acid test method remained unvalidated. FDA1306; FDA1175. FDA subsequently requested that Hill revise its labeling to remove references to the testing method and the amount of peanut protein in the product. FDS1266–78; FDA1254–62. Hill declined to do so. FDA1252–53. Accordingly, in a complete response letter dated September 25, 2009, FDA informed Hill that Supplement ▓ was not approvable because Hill declined to make FDA's requested changes to Hill's product labeling. FDA1290. ▓▓▓▓▓▓▓▓▓▓▓▓▓ (b) (4)

(b)(4)

. FDA1321.

Hill has continued to refuse to make the labeling changes that FDA requested over two years ago. Instead, Hill repeatedly has requested—and FDA has granted—extensions of time to respond to FDA's September 2009 complete response letter, claiming that it needs the time to validate its amino acid test method. FDA1297. Hill's deadline to respond to that complete response letter is now September 30, 2012.

### 4. Identi's ANDA Applications

On November 5, 2010, Identi Pharms, Inc. ("Identi") filed three applications seeking approval to sell and market generic versions of Hill's three Derma-Smoothe products—ANDA 201764 (Body Oil), ANDA 201759 (Scalp Oil), and ANDA 091306 (Ear Drops). *See* FDA1–9. Identi requested a waiver of in vivo bioequivalence studies based on 21 C.F.R. § 320.22(b)(3) for the scalp oil and based on 21 C.F.R. § 320.22(b)(1) for the body oil and ear drops.[2] FDA70–83; FDA144–64; FDA269–88. Although Identi requested a biowaiver for the body oil product under 21 C.F.R. § 320.22(b)(1), FDA recognized that 21 C.F.R. § 320.22(b)(3) is the appropriate regulation and therefore analyzed Identi's request under that regulation. *See* FDA153.

### 5. FDA's Approval Decisions

On October 17, 2011, FDA granted Identi a biowaiver for each of its products, approved Identi's ANDAs, and concluded that Identi's products are bioequivalent to the reference listed drugs, Hill's Derma-Smoothe/FS products. *See* FDA1–9. Identi has given intervenor-defendant

---

[2] 21 C.F.R. § 320.22(b)(3) provides that a drug product's in vivo bioequivalence may be considered self-evident if the drug product: (1) is "a solution for application to the skin"; (2) contains "an active drug ingredient in the same concentration and dosage form" as the approved branded drug product; and (3) contains "no inactive ingredient or other change in formulation" from the approved branded drug product "that may significantly affect absorption of the active drug ingredient," 21 C.F.R. § 320.22(b)(3). 21 C.F.R. § 320.22(b)(1) provides that an otic drug product's in vivo bioequivalence may be considered self-evident if the drug product: (1) is an "otic solution"; and (2) contains "the same active and inactive ingredients in the same concentration" as the branded drug product. 21 C.F.R. § 320.22(b)(1).

Amneal the exclusive license to manufacture and market the generic products, which were launched in mid-November 2011. Although the generic product labels include precautions for use by peanut-sensitive individuals, they do not include the following statement that still appears on the labeling for Hill's products (despite FDA's request that Hill remove it): "The peanut oil used in [product] is tested for peanut proteins through amino acid analysis which can detect the quantity of amino acids to below 0.5 parts per million." *See* FDA10–12; FDA84–86; FDA165–66.

FDA issued a stay of approval as to Identi's ear drops on November 14, 2011 in order to reconsider their approval. FDA296. Upon reconsideration, FDA determined that although the agency had granted a biowaiver for that ANDA under 21 C.F.R. § 320.22(b)(1), that regulatory provision did not in fact apply. FDA270–71. Instead, FDA decided that the ANDA was entitled to a biowaiver under 21 C.F.R. § 320.24(b)(6). *Id.*; FDA297–306. The agency therefore lifted the stay of approval and reaffirmed its approval of the ear drops on November 18, 2011. FDA308.

### C. Procedural History

Hill brought this action against the Federal defendants on November 4, 2011, moving for a preliminary injunction to prevent the marketing and distribution of the three generic products. *See* ECF Nos. 1, 3. Amneal, which is exclusively licensed to manufacture, market, and sell the generic products, moved to intervene as a party defendant, which this Court granted. *See* Minute Order [32], Nov. 29, 2011.

On December 2, 2011, this Court issued a Memorandum Opinion and Order denying Hill's preliminary injunction motion based on "Hill's inability to demonstrate any likelihood of success on the merits of its claims against FDA." Mem. Op. [44] at 17.

12

Hill filed an amended complaint on January 11, 2012, adding the claim that FDA should have required a clinical endpoint bioequivalence trial for Identi's scalp oil product. The parties' Cross-Motions for summary judgment are now pending.

## II.  LEGAL STANDARDS

### A. Summary Judgment and APA

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). However, in a case involving review of a final agency action under the Administrative Procedure Act, 5 U.S.C. § 706, the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record. *See AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 81 (D.D.C. 2007); *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89–90 (D.D.C. 2006). Under the APA, the agency's role is to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas the district court's function "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985). Summary judgment thus serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review. *See Richard v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

The decision of the FDA to approve a drug is an informal agency action. *Scott v. FDA*, 728 F.2d 322, 324 (6th Cir. 1984); *Upjohn Mfg. Co. v. Schweiker*, 681 F.2d 480, 483 (6th Cir. 1982). Under the APA, the Court shall "hold unlawful and set aside agency action, findings and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

13

accordance with law." 5 U.S.C. § 706(2)(A). In evaluating agency decision making under the APA, the Court's only role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens of Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds, Califano v. Sanders*, 430 U.S. 99 (1977). The scope of review "under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983). Administrative actions are presumed valid; thus, a "court will not second guess an agency decision or question whether the decision made was the best one." *C & W Fish Co. v. Fox*, 931 F.2d 1556, 1565 (D.C. Cir. 1991). The APA only requires the Court to decide whether the agency "articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983) (citations omitted).

Where, as here, an agency's technical expertise is involved, the reviewing court should be particularly zealous in guarding the agency's discretion. *March v. Oregon Natural Res. Council*, 490 U.S. 360, 376–77 (1989); *see also Baltimore Gas*, 462 U.S. at 103 (holding that "[w]hen examining . . . [a] scientific determination . . . a reviewing court must generally be at its most deferential."). The court "must look at the decision not as the chemist, biologist or statistician that [it is] qualified neither by training nor experience to be, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality." *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc). The D.C. Circuit has "held on a number of occasions that FDA interpretations of the FDCA receive deference, as do its interpretations of its own regulations unless plainly erroneous or inconsistent with the regulations." *Novartis Pharms. Corp. v. Leavitt*, 435 F.3d 344, 349 (D.C. Cir. 2006) (citing

*Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 883 (D.C. Cir. 2004); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1071 n.13 (D.C. Cir. 1998)).

### B. Administrative Record and Extra-Record Materials

In an APA case, the Court reviews the administrative record that was before the agency at the time of the agency's decision—not "some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). "If a Court is to review an agency's record fairly, it should have before it neither more nor less information than did the agency when it made its decision." *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984). Because actions reviewed under the APA are generally limited to the administrative record, 5 U.S.C. § 706, there are no questions of fact for the Court to resolve. *Hospital of Univ. of Pa. v. Sebelius*, 634 F. Supp. 2d 9, 12–13 (D.D.C. 2009).

Although "judicial review of agency action is normally to be confined to the administrative record," the D.C. Circuit has observed that in eight situations, courts have departed from the general rule and permitted the introduction of extra-record information. *Esch v. Yeutter*, 876 F.2d 976, 991 & n.166 (D.C. Cir. 1989). However, this Court has distinguished between cases in which a party argues that it should be allowed to supplement the record with information that should have been included in the record but was not, and cases in which a party asks for consideration of extra-record material because otherwise judicial review would be "unnecessarily difficult." *Cape Hatteras Access Preserv. Alliance v. U.S. Dep't of Interior*, 667 F. Supp. 2d 111, 114–15 (D.D.C. 2009) (Lamberth, C.J.). The *Esch* exceptions are to be "sparingly applied to only those cases where extra-record evidence [is] necessary to make judicial review effective." *Id.* at 115.

III.   ANALYSIS

The parties' Cross-Motions for summary judgment turn upon the propriety of two FDA actions: first, FDA's decision to grant biowaivers to Identi; and second, FDA's determination that the label for the approved generics using USP-NF refined peanut oil need not refer to Hill's unvalidated peanut protein assays.  Before reaching the merits of the parties' summary judgment arguments, however, the Court will address plaintiff's Motion for leave to file two supplemental declarations.

A.  **Plaintiff's Extra-Record Submissions**

Hill submitted 21 extra-record declarations along with its Motion for summary judgment. Additionally, Hill has filed a Motion [89] for leave to file two supplemental declarations.  Hill argues that these materials support its motion for summary judgment and further establish that granting an injunction is in the broader public interest.  Hill cites *Esch* to support its assertion that in complex cases that turn on technical issues, the Court may refer to extra-record materials as background to put the issues in context and to ensure that judicial review is effective.

The declarations that Hill seeks to file pertain to alleged adverse events that were reported from January through March 2012—after FDA responded to Hill's citizen petition in March 2009 and approved Identi's generic products in October and November 2011.  These declarations present information that was not before FDA at the time of the challenged decisions, and therefore are not relevant to the issue before the Court: whether FDA's decisions were well-reasoned based upon the information available to FDA at the time FDA made those decisions. *See Nat'l Audubon Soc'y v. Hester*, 801 F.2d 405, 407 (D.C.Cir. 1986).  Allowing Hill to file post-decision adverse event reports would violate the well-settled principle that in order "to review an agency's action fairly" a court "should have before it neither more nor less

information than did the agency when it made its decision." *Walter O. Boswell Mem'l Hosp.*, 749 F.2d at 792. Moreover, Hill has not shown that extra-record evidence is necessary to make judicial review effective because FDA "failed to examine all relevant factors or to adequately explain its grounds for decision, or . . . the agency acted in bad faith or engaged in improper behavior." *IMS, P.C. v. Alvarez*, 129 F.3d 618, 624 (D.C. Cir. 1997); *see also Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010); *Cape Hatteras*, 667 F. Supp. 2d at 116; *Oceana, Inc. v. Locke*, 674 F. Supp. 2d 39, 45 (D.D.C. 2009), *rev'd on other grounds*, 670 F.3d 1238 (D.C. Cir. 2011). The Court therefore denies plaintiff's Motion for leave to file two supplemental declarations and disregards the 21 extra-record declarations submitted with plaintiff's Motion for summary judgment, insofar as plaintiff seeks to use these extra-record materials to support its contention that FDA's actions were arbitrary and capricious.

Although the Court's review of the merits is confined to the administrative record, the Court may consider the extra-record declarations submitted by Hill to the extent that they are relevant to the non-merits factors of Hill's request for injunctive relief. However, as this Memorandum Opinion will reveal, Hill has not succeeded on the merits of its claims against defendants. The Court therefore need not reach the non-merits factors of Hill's request for injunctive relief, rendering the extra-record materials irrelevant and inadmissible for any purpose.

### B. Biowaivers

When FDA approved Identi's ANDAs for generic versions of Hill's products, it granted a biowaiver for the scalp oil and body oil ANDAs under 21 C.F.R. § 320.22(b)(3) and a biowaiver for the ear drop ANDA under 21 C.F.R. § 320.24(b)(6). Hill now argues FDA's decision to

grant these biowaivers was arbitrary and capricious, an abuse of discretion, and in violation of statutory and regulatory requirements.

### 1. *Scalp Oil and Body Oil Biowaivers Granted under 21 C.F.R. § 320.22(b)(3)*

FDA granted Identi a biowaiver for the scalp oil and body oil ANDAs under 21 C.F.R. § 320.22(b)(3), which requires that the generic drug product: (1) "is a solution for application to the skin"; (2) "contains an active drug ingredient in the same concentration and dosage form as a drug product that is the subject of an approved full new drug application or abbreviated new drug application"; and (3) "contains no inactive ingredient or other change in formulation from the drug product ... that may significantly affect absorption of the active drug ingredient." 21 C.F.R. § 320.22(b)(3)(i)–(iii). Hill challenges the scalp oil and body oil biowaivers on the grounds that FDA's determination that the generic products satisfy (b)(3)(i) and (b)(3)(iii) is not supported by record evidence.[3]

#### a. Solution

First, Hill contends that Identi was not entitled to a biowaiver because there is no evidence in the administrative record establishing that Hill's products are "solutions," so the requirement of 21 C.F.R. § 320.22(b)(3)(i) was not met. According to Hill, there is no record evidence that FDA relied on any data, tests, or scientific basis when it concluded that Hill's products are solutions. Rather, Hill says, FDA granted biowaivers based on blanket statements and assumptions that these products are solutions. FDA correctly points out that under the regulation, the relevant inquiry that FDA must undertake is whether the drug product that is the subject of the ANDA application is a solution—not whether Hill's products are solutions. *See* 21 C.F.R. § 320.22(b)(3). Hill has clarified its position to be that there is no evidence to support

---

[3] Hill does not, however, challenge FDA's finding that the generic products satisfy (b)(3)(ii)— that the generic products contain "an active drug ingredient in the same concentration and dosage form as a drug product that is the subject of an approved full new drug application or abbreviated new drug application." 21 C.F.R. § 320.22(b)(3)(ii).

FDA's determination that Identi's products are solutions, but if they are solutions, then by definition they are not bioequivalent to Hill's products because Hill's products are suspensions, not solutions.

The parties agree that when FDA interpreted the term "solution," it correctly relied on the United States Pharmacopeia 31 ("USP 31"), <1151> Pharmaceutical Dosage Forms. *See* FDA796–807. USP 31 describes solutions as "liquid preparations that contain one or more chemical substances dissolved, i.e., molecularly dispersed, in a suitable solvent or mixture of mutually miscible solvents." FDA802. This definition is an appropriate reference both because USP is part of the administrative record and because Congress has designated USP as an "official compendium" under the FDCA. 21 U.S.C. § 321(j).

FDA reasonably concluded that Identi's products satisfy the USP definition of "solution" based upon information from Identi's development reports and product specifications. Identi's finished product specifications describe each product as a "clear non-aqueous liquid, colorless to light straw colored." FDA437; FDA437. The chemistry reviews performed on Identi's products also describe the products as "clear, colorless to light straw colored liquid[s]" and describe the drug substance (fluocinolone acetonide) as "a white to practically white crystalline powder" that is "freely soluble in acetone and glacial acetic acid, sparingly soluble in chloroform and methanol, and very slightly soluble in ether." FDA37; FDA111. The development report for each ANDA product describes the process by which Identi's products are formulated. Identi explained that ████████████████████████████████████████████ (b)(4) ████████████████████████████████████████████████████████████████ FDA381; FDA341. For this reason, █████████████████████████████████ (b)(4) ███████████████████████████████████████████████████." *Id.* Therefore, the

active ingredient, fluocinolone acetonide, is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (b)(4)
FDA373; FDA335. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (b)(4)

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ FDA373;
FDA333. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (b)(4)

▓▓▓▓▓▓▓▓▓▓▓▓.” FDA381; FDA341.

Additionally, because the generic and innovator products otherwise must be shown to be the "same," *see* 21 U.S.C. § 355(j)(2)(A), the attributes of the innovator product may shed light on whether the generic product is a solution. Hill, however, claims that its own products are not solutions, basing its arguments in large part upon inadmissible extra-record materials. However, record evidence clearly establishes otherwise. In responding to Hill's citizen petition, FDA determined that Hill's products are solutions for purposes of 21 C.F.R. § 320.22(b)(3). FDA656; FDA793; FDA651–52 n.37. FDA reasoned that Hill's products met this definition because each product "is a multicomponent material that is in a liquid state, i.e., there are no particles and everything is dissolved." FDA793. Hill argues that its products are not solutions because they do not contain citric acid or propylene glycol, but the USP definition of "solution does not specify any particular solvent." FDA802. In its citizen petition response, FDA referenced the USP definition of "topical solutions," which are "solutions, usually aqueous but often containing other solvents, such as alcohol and polyols, intended for topical application to the skin." FDA651–52 n.37. FDA noted that the USP definition of solution "does not specify what the solvent should be (in other words, as with Derma-Smoothe, the solvent can be oil)." *Id.* Moreover, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (b)(4)

▓▓▓▓▓▓▓▓▓▓ is irrelevant to whether the products are solutions, because the fluocinolone acetonide is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (b)(4)

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (b)(4) ." FDA341; FDA381.   In fact, in a memorandum resolving bioequivalence issues related to Hill's citizen petition, FDA determined that in the context of 21 C.F.R. § 320.22(b)(3) Derma-Smoothe is a solution, and on that basis concluded that "generic solutions that reference Derma-Smoothe could potentially qualify for a biowaiver if the other two elements of the regulation are satisfied." FDA887.

Hill also claims that its products are not solutions because the FDA-approved labeling states that the Derma-Smoothe scalp oil and body oil products must be shaken well before use. *See* FDA1023; FDA1025; FDA1063; FDA1067; FDA1069.   Hill bases this argument on the flawed premise that solutions are stable under all temperature conditions and, therefore, that no solution needs to be shaken before use or should be stored under a controlled temperature.   But as the USP description of "solution" reveals, "[s]ubstances in solutions . . . are more susceptible to chemical instability than the solid state."   FDA802.   The USP therefore advises that all solutions should be "stored away from excessive heat."   *Id.*   Hill also argues that its products are not solutions because its batch production record from 1984 describes them as suspensions that must be mixed continuously during packaging operations.   However, the fact that Hill continuously mixes its products does not conclusively establish that they are not solutions under the USP definition.   Nor is Hill's description of its products as suspensions conclusive, for Hill's products do not meet the USP definition of "suspensions": "liquid preparations that consist of solid particles dispersed throughout a liquid phase in which the particles are not soluble." FDA804.   Record evidence makes clear that the active ingredient in Hill's products is dissolved in isopropyl alcohol, a solvent, rather than remaining dispersed in solid form.   And in any event, Identi's products ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (b)(4).   *See* FDA352.

The evidence in the administrative record unequivocally supports FDA's finding that Identi's scalp oil and body oil products are in fact solutions, satisfying 21 C.F.R. § 320.22(b)(3)(i). The Court finds that in making this decision, the agency "articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983) (citations omitted). To the extent that Hill has made additional arguments to the contrary, the Court rejects those as unsupported by the administrative record.

### b. Omission of Fragrances

Hill also challenges FDA's determination that despite the omission of two fragrances from Identi's generic scalp oil and body oil products, the products contain "no active ingredient or other change in formulation from the [branded] product . . . that may significantly affect absorption of the active drug ingredient." 21 C.F.R. § 320.22(b)(3)(iii). Hill argues that FDA's decision that the omission of the two fragrances would not affect the safety and efficacy of the generic product is not supported by record evidence and is therefore arbitrary and capricious. *See* FDA71.

Provided that the generic product meets the requirements of 21 C.F.R. §§ 320.22(b)(3)(i) and (ii), a solution biowaiver may be granted when the generic product contains "no inactive ingredient or other change in formulation from [the branded product] . . . that may significantly affect absorption of the active drug ingredient . . . or that may significantly affect systemic or local availability" 21 C.F.R. § 320.22(b)(3)(iii). A separate regulation allows differences in inactive ingredients of topical drug products "provided that the applicant identifies and characterizes the differences and provides information demonstrating that the differences do not affect the safety or efficacy of the proposed drug product." 21 C.F.R. § 314.94(a)(9)(v).

Identi's scalp oil and body oil products omitted two fragrances that the Derma-Smoothe product formulation contained.  FDA71; FDA145.  Despite these omissions, the administrative record shows that FDA made a reasoned determination that the differences between Identi's formulation and Hill's formulation do not affect the safety or efficacy and do not significantly affect absorption or availability of the active drug ingredient, fluocinolone acetonide.  *See* 21 C.F.R. §§ 314.94(a)(9)(v), 320.22(b)(3)(iii).

Hill contests FDA's determination that Identi's omission of fragrances would not affect the safety and efficacy of the products with blanket statements that the different formulations may affect absorption of the active ingredient and create safety issues.  The sole administrative record evidence offered to support Hill's claim that a slight change in product formulation could be significant is a conclusory affidavit from Dr. Maibach submitted in support of Hill's citizen petition.  *See* FDA531–596.  FDA considered the affidavit and, in its expertise, rejected Dr. Maibach's arguments.  *See, e.g.,* FDA659; FDA661 n.65, n.66; FDA662; FDA664 n.73; DFDA667 n.81; FDA785–97; FDA791–93.  In fact, the administrative record demonstrates just the opposite of what Hill asserts.  In its bioequivalence review of Identi's products, FDA determined that the two fragrances merely function as "odor modifier[s]."  FDA153.  Additionally, in a consultation requested by FDA's Office of Generic Drugs ("OGD") as part of FDA's bioequivalence review, FDA's Division of Dermatology and Dental Products ("DDDP") confirmed that the two fragrances account for less than ▓▓percent of the total volume of Hill's products.  FDA294.  The development reports for Identi's scalp oil and body oil ANDAs had informed FDA that "[t]he fragrances are in low concentration and they do not contribute to the pharmacology of the product."  FDA334; FDA374.  Given the information that was before the agency, it was reasonable for DDDP to reference, as "a useful regulatory framework for

23

evaluation," an agency guidance providing that deletion of an ingredient intended to affect the fragrance of a drug product is "unlikely to have any detectable impact on formulation quality and performance." FDA293–94. Although that guidance applies to semi-solid dosage forms (such as creams, gels, lotions, and ointments) rather than solutions, those dosage forms, like Identi's, are applied topically—that is, the active ingredient is delivered through the skin.[4] These facts provide reasonable support for DDDP's conclusion that it "would not object to an in vivo bioavailability waiver." FDA294.

DDDP also reasonably determined that the slight changes that Identi made to the volumes of the remaining inactive ingredients—resulting from the omission of the fragrances—would not preclude a biowaiver. FDA290; FDA294. Contrary to Hill's assertion, the record demonstrates that apart from the fragrances, Hill's and Identi's products contain the same ingredients, including the same surfactant, Oleth-2. *See* FDA292. Identi's and Hill's products contain ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (b)(4)

▓▓▓▓▓▓▓▓ FDA293. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (b)(4)

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓ *Id.* What's more, the batch-to-batch variation in Hill's own products is greater than the variation in Identi's and Hill's products. FDA338; FDA378; FDA613–15. Based on these facts, DDDP concluded that it would not object to a biowaiver. *Id.* OGD relied on DDDP's conclusions in determining that the formulation differences would not affect the safety

---

[4] FDA has long applied the guideline that a 5 percent difference in the volume of inactive ingredients is acceptable, and not only in the context of semi-solid dosage forms. In fact, FDA's response to Hill's citizen petition relied on this same guidance: "The third criterion in 21 C.F.R. § 320.22(b)(3) would generally be satisfied if the generic is qualitatively the same ($Q_1$) and quantitatively essentially the same ($Q_2$) as the RLD with respect to inactive ingredients. A product is considered to be $Q_1$ if it contains the same inactive ingredients as the RLD; it will be considered $Q_2$ if the concentration or amount of each of those ingredients differs from the concentration or amount of the same ingredient in the RLD by no more than 5 percent of that ingredient." FDA656.

and efficacy of Identi's products and in granting biowaivers for those products. FDA73; FDA152–54.

The administrative record clearly establishes that, notwithstanding the omission of two fragrances from Identi's scalp oil and body oil products, the products satisfied the requirement of 21 C.F.R. § 320.22(b)(3)(iii). Nothing in the record suggests that the omission of the fragrances affects the safety or efficacy of Identi's products. Therefore, FDA's approval of Identi's scalp oil and body ANDAs was not arbitrary and capricious.[5]

### 2. Ear Drop Biowaiver Granted under 21 C.F.R. § 320.24(b)(6)

FDA initially granted Identi a biowaiver for its ear drop product under 21 C.F.R. § 320.22(b)(1), which requires a generic otic product to have "the same active and inactive ingredients in the same concentration" as the RLD. FDA273–75. Shortly after approving the ANDA for Identi's ear drop product, FDA issued a stay of approval to reconsider the biowaiver. FDA296. On reconsideration, FDA determined that a biowaiver under 21 C.F.R. § 320.22(b)(1) "was not appropriate" for Identi's ear drop product. FDA302. Nonetheless, FDA determined that Identi's ear drop product had adequately established bioequivalence under 21 C.F.R. § 320.24(b)(6), which provides that "[a]ny other approach deemed adequate by FDA ... to establish bioequivalence" is "acceptable for determining ... bioequivalence of a drug product." FDA302.

Hill challenges FDA's approval of a biowaiver for Identi's ear drop product under 21 C.F.R. § 320.24(b)(6) as arbitrary and capricious, claiming that by approving the product under

---

[5] The Court construes Hill's argument that FDA should have required clinical studies for Identi's scalp oil ANDA as a reiteration of its challenge to FDA's determination that Identi's scalp oil product qualifies for a biowaiver. However, the Court finds that because FDA properly determined that Identi's scalp oil product qualifies for a biowaiver under 21 C.F.R.§ 320.22(b)(3), Identi was not required to conduct clinical bioequivalence studies. Hill also cites errors in FDA's review memos in an attempt to show that FDA's review process was arbitrary and capricious. But upon review of these cited errors, the Court finds that they are immaterial and that despite these errors, the administrative record properly supports FDA's decision that Identi's generic scalp oil and body oil products satisfy 21 C.F.R. § 320.22(b)(3)(iii).

this provision, FDA improperly avoided the requirements of 21 C.F.R. § 320.22(b)(1). According to Hill, FDA was required to provide an explanation why Identi's products are exempt from the general rules applicable to all other otic products. But the administrative record clearly reflects that FDA did adequately explain its findings regarding Identi's ear drop product.

In reapproving a biowaiver for Identi's ear drop products, FDA cited DDDP analysis in reasoning that the difference in inactive ingredients "was minor because omission of the two fragrance components would not affect the safety or efficacy of the proposed generic product." FDA302. FDA noted that similar determinations have been made in the past under 21 C.F.R. § 320.24(b)(6), citing five examples of products for which FDA made a determination of bioequivalence under that provision without the submission of additional in vivo or in vitro data. *Id.* While reexamining the appropriateness of a biowaiver for the ear drop ANDA, FDA also recognized that Identi's ANDA did not technically comply with the regulatory requirement for the same inactive ingredients for otic solutions in 21 C.F.R. § 314.94(a)(9)(iv). *Id.* FDA notified Identi of that concern, and as part of FDA's reconsideration, Identi submitted a waiver request under 21 C.F.R. § 314.99(b) for this requirement. *Id.* Under the applicable regulatory framework, "FDA may grant a waiver if it finds that compliance with the regulatory requirement is unnecessary to evaluate the application, the alternative submission satisfies the purpose of the requirement, or the applicant's submission otherwise justifies the waiver." FDA304. FDA determined that granting a waiver in this circumstance does not involve any waiver of statutory requirements regarding inactive ingredients. *Id.* FDA stated that it would not approve an ANDA if information submitted in the application or other information showed that the inactive ingredients were unsafe. *Id.* In addition to showing that the inactive ingredients in the ear drop products are safe, FDA's analysis demonstrated that the lack of fragrance would not be expected

to affect the bioavailability of the drug product. *Id.* Therefore, because Identi's ear drops differ from the RLD merely by the omission of a "very small amount of fragrance and in all other respects is Q1/Q2 to the RLD," FDA determined that a waiver of the "same ingredients" requirement of 21 C.F.R. § 314.94(a)(9)(iv) is appropriate. *Id.*

On this basis, FDA granted a waiver under 21 C.F.R. § 314.99(b) for the regulation 21 C.F.R. § 314.94(a)(9)(iv) regarding inactive ingredient changes permitted for drug products intended for otic use, FDA304, found the product to be bioequivalent pursuant to 21 C.F.R. § 320.24(b)(6), FDA302, and reaffirmed the approval of Identi's ear drop product, FDA308. The FDA's decision is adequately supported by reasoned explanation in the administrative record. Moreover, "the FDA has wide discretion to determine how the bioequivalence requirement is met." *Bristol-Meyers Squibb Co. v. Shalala*, 923 F. Supp. 212, 218 (D.D.C. 1996). The Court therefore finds that the FDA did not act in an arbitrary and capricious manner when it granted a biowaiver for Identi's ear drop ANDA.

### C. Same Labeling Requirement

The FDCA requires that an ANDA contain "information to show that the labeling proposed for the new [generic] drug is the same as the labeling approved for the listed drug . . . except for changes required because of differences approved under a petition filed under [21 U.S.C. § 355(j)(2)(C)] or because the new drug and the listed drug are produced or distributed by different manufacturers." 21 U.S.C. § 355(j)(2)(A)(v). Permissible labeling differences include "differences in expiration date, formulation, bioavailability, . . . [or] labeling revisions made to comply with current FDA labeling guidelines or other guidance . . . ." 21 C.F.R. § 314.94(a)(8)(iv). The preamble to proposed rule 21 C.F.R. § 314.94(a)(8)(iv) demonstrates that, in implementing the statute, FDA intended to allow differences in labeling when "the reference

27

listed drug labeling does not reflect current agency labeling standards; for example, the agency may require a change in the labeling of a drug product to make available important new information about the safe use of a drug product, but the reference listed drug's labeling has not yet been updated to reflect this change." Abbreviated New Drug Application Regulations, 54 Fed. Reg. 28,872, 28,884 (proposed July 10, 1989).

Hill argues that FDA's approval of Identi's generic products was arbitrary and capricious because it violates the FDCA's "same labeling" requirement. Although the generic product labels for Identi's scalp oil, body oil, and ear drop products include precautions for use by peanut-sensitive individuals, they do not include the following statement that still appears on the labeling for Hill's products (despite FDA's request that Hill remove it): "The peanut oil used in [product] is tested for peanut proteins through amino acid analysis which can detect the quantity of amino acids to below 0.5 parts per million." *See* FDA10–12; FDA84–86; FDA165–66.

Although FDA approved a reference to the amino acid test in Hill's labeling in a 2007 NDA supplement, FDA has since concluded that this test has not been validated and is scientifically unnecessary to protect the public health. As FDA explained in its 2009 response to Hill's citizen petition, the agency has determined that the use of the USP-NF refining process ensures the safety of peanut oil used in the products at issue here. FDA667–73; FDA680–773; FDA829–84; FDA867–76; FDA1337–48. Several offices within FDA's Center for Drug Evaluation and Research ("CDER") participated in the review of Hill's citizen petition: the Office of Pharmaceutical Science ("OPS"), including the Office of Generic Drugs ("OGD") and the Office of new Drugs Quality Assessment ("ONDQA"); the Office of Surveillance and Epidemiology ("OSE"); and the Division of Dermatology and Dental Products ("DDDP"). After convening a meeting with representatives of their offices, and after reviewing their memoranda,

Dr. Janet Woodcock, director of CDER, concluded that "the available evidence demonstrates that the standardized process for fully refining peanut oil that is embodied in the USP-NF monograph reduces peanut allergen to levels that are below the level likely to produce an allergic response in peanut-sensitive individuals." FDA1346.

Among other things, Dr. Woodcock relied upon a review of the scientific literature conducted by Dr. Keith Webber, Deputy Director of OPS, and Dr. Jay Slater, Deputy Director, Division of Bacterial, Parasitic and Allergenic Products, Office of Vaccines Research and Review, Center for Biologics Evaluation and Research. FDA1343–46. After reviewing the scientific literature, Drs. Webber and Slater concluded: "The quantity of orally administered peanut protein required to produce an allergic response in many peanut-sensitive individuals appears to be greater than 50 micrograms, equivalent to 1000 ppm in a standard application." FDA871. They further noted that the scientific literature showed that "[f]ully refined peanut oil contains only negligible levels of residual protein, probably less than 10 ppm." FDA872; *see also* FDA670–71. On this basis, they concluded "that a manufacturer of fluocinolone acetonide topical oil that is formulated with peanut oil as the vehicle, *whether Hill Dermaceuticals or another manufacturer,* must ensure that the peanut oil used is fully refined and meets the USP NF standard. If manufacturers use refined peanut oil that meets the USP NF standard, we can be confident that the peanut oil will be acceptably free of allergenic protein." FDA875 (emphasis added).

Dr. Woodcock noted that OSE's report of adverse events confirmed the conclusion reached by Drs. Webber and Slater. FDA1346. OSE had reviewed adverse event reports for six currently-marketed products containing refined peanut oil, including Hill's Derma-Smoothe and DermOtic products, in addition to four products not manufactured by Hill. FDA835. From all

reported adverse events for these six products, OSE found only one "probable report of an allergic reaction in a patient with peanut allergy," which was associated with Derma-Smoothe in a child with a history of peanut allergy. FDA852. An OGD scientist had pointed out that "[t]o the best of my knowledge, none of these approved products currently has a valid test for the measurement of residual peanut protein." FDA860. AS OGD found, "[w]hile there is no assurance that NF refining process will totally eliminate any risk in the most sensitive individuals, approval of a generic product would in no way increase the risk over that posed by the innovator product, since a generic would not be approved without assurance that the peanut oil is refined per the NF process and would also be required to seek approval for any change in source of peanut oil." FDA860. Dr. Woodcock further noted that "Derma-Smoothe products contain statements in the Precautions section of the labeling, which discourage use in peanut-sensitive individuals." FDA1346. She advised that Derma-Smoothe and its generic counterparts should continue to bear such cautionary statements regarding use by peanut sensitive individuals. *Id.*

Upon examination and analysis of the studies conducted by the various FDA offices, Dr. Woodcock concluded that "Hill has been marketing Derma-Smoothe since 1988 without a validated test, and the safety of the product has likely been achieved through use of refined peanut oil from a source that meets USP-NF standards. Nothing more should be required from a generic applicant." FDA1347. Dr. Woodcock's reasoning and conclusions are reflected in the citizen petition response. FDA667–73. As discussed above, FDA has repeatedly requested that Hill remove the references to its unvalidated test, and Hill has refused to do so. As a result of FDA's response to Hill's citizen petition, Identi's ANDAs noted that the firm revised its insert

labeling to remove the labeling statements describing the testing methodology for peanut proteins as per guidance from the agency. *See* FDA14; FDA89; FDA98; FDA100; FDA177.

There is no merit to Hill's argument that the FDA regulation implementing the statute improperly expands the different manufacturer exception to the same labeling requirement. The regulation provides that labeling for generic products must be the same as the listed drug unless "the drug product and the reference listed drug are produced or distributed by different manufacturers. Such differences . . . may include differences in expiration date, formulation, bioavailability, . . . [or] labeling revisions made to comply with current FDA labeling guidelines or other guidance . . . ." 21 C.F.R. § 314.94(a)(8)(iv). Rather than expand upon the statute, this regulation merely provides some examples of labeling differences permitted under the statute.

Equally meritless is Hill's argument that this regulation is improper on its face because it attempts to give future, unidentified guidance documents binding legal effect. This challenge to the regulation completely mischaracterizes the FDA's reliance on its citizen petition response. Rather than giving a guidance document binding legal effect, FDA approved Identi's labeling because Hill's test is not validated and the agency had previously found that the USP-NF standard is sufficient. FDA667–73. Although this Court, in denying Hill's Motion for a preliminary injunction, stated that FDA's response to Hill's citizen petition is "other guidance" contemplated by the regulation, that petition response is not a "guidance document" under 21 C.F.R. § 10.115(b)(3). Moreover, FDA did not give binding legal effect to any type of guidance document. Rather, FDA thoroughly examined the facts and provided a reasoned explanation why Identi did not need the same labeling as Hill. *See, e.g.*, FDA655; FDA667–73; FDA310–11.

31

There is ample evidence in the administrative record to support FDA's finding that the "different manufacturers" exception allows the difference in labeling at issue here—that is, the omission from Identi's labeling of a reference to an unvalidated amino acid test for residual peanut protein that is used by Hill. The Court therefore finds that FDA's approval of Identi's ANDAs with labeling different than Hill's product labeling was not arbitrary and capricious and did not violate the FDCA.

### D.  Injunctive Relief

Because Hill cannot prevail on the merits of its case, Hill is not entitled to a permanent injunction. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987). The Court therefore need not reach the other factors relevant to Hill's request for a permanent injunction.

### IV.     CONCLUSION

The Court finds that in approving Identi's ANDAs, the FDA "articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983) (citations omitted). For the foregoing reasons, the Court DENIES plaintiff's Motion [59] for summary judgment and GRANTS defendants' Motions [68, 71, 78] for summary judgment. Additionally, the Court DENIES plaintiff's Motion [89] for leave to file. A separate Order consistent with this Memorandum Opinion shall issue this date.

May 8, 2012

ROYCE C. LAMBERTH
Chief Judge
United States District Court

32